IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

FILED

May 17, 2013
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 12-0100

In Re: BRANDI B.

Appeal from the Circuit Court of Pocahontas County
The Honorable James J. Rowe, Judge
Case No. 11-JS-05

AFFIRMED, IN PART; REVERSED, IN PART
and REMANDED WITH DIRECTIONS

Submitted: April 9, 2013
Filed: May 17, 2013

Dewitt W. Daniell, Esq.
Office of the Public Defender
Lewisburg, West Virginia
Attorney for Petitioner

Patrick Morrissey, Esq.
Attorney General
Andrew Mendelson, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.

JUSTICE DAVIS, deeming herself disqualified, did not participate in the decision of this case.

SENIOR STATUS JUSTICE MCHUGH, sitting by temporary assignment.

SYLLABUS BY THE COURT

1.      "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."  Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W. Va. 138, 459 S.E.2d 415 (1995).

2.      "The constitutionality of a statute is a question of law which this Court reviews *de novo*."  Syl. Pt. 1, *State v. Rutherford*, 223 W. Va. 1, 672 S.E.2d 137 (2008).

3.      "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard.  We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*.'  Syl. Pt. 4, *Burgess v. Porterfield*, 196 W Va. 178, 469 S.E.2d 114 (1996)."  Syl. Pt. 2, *Nutter v. Nutter*, 218 W. Va. 699, 629 S.E.2d 758 (2006).

4.      Whether a juvenile's absences from school are "habitual" and are "without good cause," pursuant to West Virginia Code § 49-1-4(15)(C) (2009) is to be determined on a case-by-case basis.  Such determination lies within the sound discretion of the circuit court and is subject to appellate review only upon an abuse of that discretion.

5. "The legislature is vested with a wide discretion in determining what the public interest requires, the wisdom of which may not be inquired into by the courts; however, to satisfy the requirements of due process of law, legislative acts must bear a reasonable relationship to a proper legislative purpose and be neither arbitrary nor discriminatory." Syl. Pt. 1, *State v. Wender*, 149 W.Va. 413, 141 S.E.2d 359 (1965).

6. "The Due Process Clause, Article III, Section 10 of the West Virginia Constitution, requires procedural safeguards against State action which affects a liberty or property interest." Syl. Pt. 1, *Waite v. Civil Serv. Comm'n*, 161 W. Va. 154, 241 S.E.2d 164 (1977).

7. "When due process applies, it must be determined what process is due and consideration of what procedures due process may require under a given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been impaired by government action." Syl. Pt. 2, *Bone v. W. Va. Dep't of Corrections*, 163 W.Va. 253, 255 S.E.2d 919 (1979).

8. West Virginia Code § 49-5-11(d) (2010) and West Virginia Code § 49-5-11a(b)(1) (1998) provide authority for the circuit court to place a status offender on probation and order terms and conditions of such probation as the court determines

necessary to "enforce compliance with a service plan or to restrain actions that interfere with or defeat a service plan[.]"

9. "[A] petition seeking an order regarding transferring custody of the status offender to the Department and/or out-of-home placement under *W. Va. Code*, 49–5–11a(b)(2) [1998] . . . may only be granted upon a showing by clear and convincing evidence that such a custody or placement order is actually necessary; that the effective provision of services cannot occur absent such an order; and that all reasonable efforts have been made to provide appropriate services without an out-of-home placement or custody transfer; and orders granting such placement and/or transfer must be based on specific findings and conclusions by the court with respect to the grounds for and necessity of the order." Syl. Pt. 2, in part, *State v. Damian R.*, 214 W. Va. 610, 591 S.E.2d 168 (2003).

10. "[As to] a circuit court's decision under *W. Va. Code*, 49–5–11a(b)(2) [1998] to award custody of a juvenile status offender to the Department of Health and Human Resources[,] . . . the constitutional rights of due process, representation by counsel, notice, opportunity to be heard, and to present and cross-examine witnesses must be afforded to the juvenile and the affected parent in a proceeding brought pursuant to said statutory provision." Syl. Pt. 3, in part, *State v. Damian R.*, 214 W. Va. 610, 591 S.E.2d 168 (2003).

11.     Pursuant to West Virginia Code § 49-5-2 (2007), the jurisdiction of courts over a juvenile adjudicated as a status offender as defined in West Virginia Code § 49-1-4(15) extends only until the juvenile attains the age of eighteen.

WORKMAN, Justice:

Petitioner/Defendant below, Brandi B., appeals the Circuit Court of Pocahontas County's December 20, 2011, order adjudicating her a status offender on the basis of habitual truancy pursuant to West Virginia Code § 49-1-4(15)(C) (2009) and ordering certain disposition pursuant to West Virginia Code §§ 49-5-11 (2010) and 49-5-11a (1998). Petitioner alleges that the circuit court 1) erred by adjudicating her an habitual truant on the basis of absences which were occasioned by an out-of-school suspension; 2) abused its discretion in its imposition of the proportionate length and various terms of probation and transfer of legal custody to the Department of Health and Human Resources (hereinafter "DHHR"); and 3) further erred by imposing probation which extends past her eighteenth birthday.

For the reasons more fully set forth below, we find that the circuit court committed no error in adjudicating petitioner a status offender and placing her on supervised probation. However, we do find that the circuit court erred in failing to make adequate findings regarding transfer of legal custody to the DHHR and in exceeding its jurisdiction by attempting to impose probation beyond the age of eighteen. We therefore affirm, in part, reverse, in part, and remand for further proceedings and entry of a modified order.

1

## I.  FACTS AND PROCEDURAL HISTORY

On October 11, 2011, the Pocahontas County Attendance Director filed a petition in Pocahontas County Circuit Court against the then 14-year-old petitioner, alleging that she had six unexcused absences from school between September 22 and October 6, 2011 and was therefore a "delinquent child" for committing the status offense of truancy.  The petition further alleged that petitioner had previously been placed on a sixty-day improvement period by a Pocahontas County magistrate at the end of the preceding school year, which improvement period was to continue into the 2011-2012 school year and required her to have no further unexcused absences.[1]

Prior to the adjudication hearing, and in lieu thereof, on December 20, 2011, petitioner offered to stipulate that she was absent from school on nine days between September 22, 2011 and October 28, 2011, but that six of the nine days were due to an out-of-school suspension resulting from her involvement in a fight.[2]  As a result, petitioner denied that she was an habitual truant.  Petitioner filed a "Motion for Judgment as a Matter of Law," arguing that the six absences due to suspension constituted "good

---

[1] The record contains no documentation from this previous truancy petition, nor any information on how many absences gave rise to the petition.

[2] The offer to stipulate also noted that petitioner's mother had "testified" (presumably at the preliminary hearing) that the absences on September 22 and 23 were due to illness and that she sent a note from petitioner's doctor, but conceded that petitioner had failed to produce such documentation for the court.

2

cause" under West Virginia Code § 49-1-4(15)(C) and could not be used to adjudicate her an habitual truant. Petitioner argued that the three remaining non-suspension unexcused absences were insufficient to prove "habitual" truancy as required by statute.

The circuit court disagreed, reasoning that a student is expected to abide by the code of conduct while at school and that absences occasioned by a failure to do so did not constitute "good cause." The circuit court found that, although the three undisputed absences would not constitute "habitual" truancy, the total nine absences including the six suspension days did. The court then adjudicated petitioner to be a status offender, referred her to DHHR for services and placed her on probation[3] until she graduates from high school.[4] As further part of its disposition, the court ordered that petitioner be placed in the legal custody of DHHR but remain in the physical custody of her biological mother. In support of the transfer of custody, the circuit court's order states simply that

---

[3] As part of her probation, the circuit court ordered that petitioner comply with the following terms and conditions: 1) that she not change her status of school unless approved by the circuit court; 2) that she have no unexcused absences/tardies, failing grades, or disciplinary problems at school; 3) that she abide by her parents' supervision and the terms of her probation; 4) that she "cooperate with the MDT process by attending and participating in any and all meets [sic]"; 5) that she abstain from use/possession of alcohol, drugs, marijuana, controlled substances, or prescriptions not prescribed by a doctor; and 6) that she submit to random drug screens of blood, breath, or urine at the request of the Probation Officer and at her expense.

[4] Petitioner will turn eighteen on May 6, 2015; she will presumably graduate one month later, in June, 2015. The prosecuting attorney questioned the length of probation to ascertain whether the court intended it to last simply until petitioner was eighteen or until she graduated high school, and the court confirmed that it was to last until graduation.

3

"it is contrary to the welfare of the child for her legal custody to remain with her parents and it is in her best interest of the child [sic] to have her legal custody be with the Department[.]"  This appeal followed.

## II.  STANDARD OF REVIEW

"Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."  Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W. Va. 138, 459 S.E.2d 415 (1995).  Moreover, "[t]he constitutionality of a statute is a question of law which this Court reviews *de novo*."  Syl. Pt. 1, *State v. Rutherford*, 223 W. Va. 1, 672 S.E.2d 137 (2008).  Petitioner's assignments of error regarding the court's disposition order implicate the following standard of review:

> "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*."  Syl. Pt. 4, *Burgess v. Porterfield*, 196 W Va. 178, 469 S.E.2d 114 (1996).

Syl. Pt. 2, *Nutter v. Nutter*, 218 W. Va. 699, 629 S.E.2d 758 (2006).  With these standards in mind, we proceed to the parties' arguments.

## III.  DISCUSSION

Petitioner makes three assignments of error, each containing various subsidiary issues.  Generally, however, petitioner assigns as error both the circuit court's adjudication and disposition of the habitual truancy petition filed against her.  As such,

4

our discussion will address the assigned errors in the context of the particular stage of the underlying proceeding at issue.

## A.

### *Truancy Adjudication*

We first address petitioner's contention that the circuit court erred in adjudicating her an habitual truant, and therefore a "status offender," on the basis of school absences occasioned by an out-of-school suspension. West Virginia Code § 49-1-4(15) describes the conduct making a juvenile susceptible to adjudication as a "status offender." Subparagraph 15(C) provides the pertinent definition at issue herein, and defines "a juvenile who has been adjudicated as one . . . [w]ho is habitually absent from school without good cause" as a status offender.

### 1.    *"Good Cause" Determination*

Petitioner contends that the circuit court erred in its interpretation of the "good cause" language of the habitual truancy statute by refusing to find that her absences due to out-of-school suspension constituted "good cause." In support of her argument, petitioner attempts to distinguish "unexcused absences" from absences "without good cause." Although she concedes that her absences were unexcused, she urges this Court to adopt and implement Black's Law Dictionary's definition of "good cause" which is: "a legally sufficient reason." Black's Law Dictionary 251 (9th Ed. 2009) (emphasis added). Under this definition, petitioner contends that her absence from school

5

was mandated by the school and therefore provides her a "legal excuse" which equates to "good cause." Respondent counters that it is simply "absurd" to attempt to characterize an absence due to suspension as "good cause" and further argues that if petitioner were so concerned about being adjudicated habitually truant, she should simply have complied with the code of conduct at school and avoided suspension. During oral argument, respondent further contended that the reference in the petition to petitioner's prior absences, which gave rise to imposition of an improvement period in the preceding school year, essentially "rescued" the circuit court's finding of habitual truancy and, in effect, mooted our analysis of the six suspension absences.[5]

Petitioner asserts that the circuit court's error was one of statutory interpretation and contends that resolution of this issue calls for application of our long-standing rules of statutory construction. However, upon closer review, it is clear that the

---

[5] The record does not support this argument. Although there is reference to the improvement period in the petition underlying this appeal, it does not include information on how many absences precipitated the improvement period. More importantly, however, based upon that portion of the transcript of the adjudication hearing provided in the appendix record, the circuit court made no reference whatsoever to these prior absences in making its findings. Rather, the circuit court demonstrated its exclusive focus on the nine absences specifically set forth in the petition by stating that it believed that nine unexcused absences would constitute "habitually truant" but that if it excluded the six suspension absences, three unexcused absences would not be "habitual."

Additionally, although a record of the prior improvement period does not appear in the appendix record, based upon the scant description of the improvement period set forth in the petition, to the extent that petitioner's prior improvement period was ordered by a magistrate, it was improvidently ordered. *See In re Greg H.,* 208 W. Va. 756, 542 S.E.2d 919 (2000) (holding that only circuit court may exercise statutory authority to order improvement period pursuant to West Virginia Code § 49-5-9(b)).

6

circuit court's determination that the suspension absences were not "good cause," derives not from its interpretation of this statutory language, but rather, constitutes a finding by the circuit court on a matter left to its sound discretion by the Legislature. This Court has historically held that "good cause" determinations prescribed by statute lie within the lower court's discretion. *See State ex rel. Shorter v. Hey*, 170 W. Va. 249, 294 S.E.2d 51 (1981) (holding that "good cause" determination pursuant to West Virginia Code § 62-3-1 for trial continuance outside of term of indictment is within court's discretion); *State ex rel. Foster v. Luff,* 164 W. Va. 413, 264 S.E.2d 477 (1981) (holding that determination of "good cause" for additional expert fees under West Virginia Code § 51-11-8 was within discretion of trial court); *State v. Wooldridge*, 129 W. Va. 448, 40 S.E.2d 899 (1946) (holding that "good cause" for change of venue under West Virginia Code § 62-3-13 rests within the discretion of the trial court).

Nevertheless, petitioner urges this Court to invade the province of the circuit court and decree that disciplinary absences *per se* constitute good cause and thereby judicially insert into the statute a definition which is not there. However, "'it is not for [courts] arbitrarily to read into [a statute] that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, *we are obliged not to add to statutes something the Legislature purposely omitted.*'" *Longwell v. Bd. of Educ. of Cnty. of Marshall,* 213 W. Va. 486, 491, 583 S.E.2d 109, 114 (2003) (citing *Banker v. Banker*, 196 W. Va. 535, 546–47, 474 S.E.2d 465, 476–77 (1996) (emphasis in original). We find that the statute at issue quite deliberately omits an

7

enumerated list of absences for "good cause" to allow the circuit court to give full effect to the protective and rehabilitative goals of the status offender statutory scheme.[6] Other courts have observed the broad reach of similar statutes, noting that "language limitations are particularly acute for the draftsmen of juvenile laws designed to implement the broad social policy" of the juvenile justice system. *District of Columbia v. B. J. R.*, 332 A.2d 58, 61 (D. C. 1975). Had our Legislature intended to strip the circuit court of the discretion to determine whether certain categories of absences are "without good cause," it could have simply indicated as much.[7]

In *State ex rel. Harris v. Calendine*, 160 W.Va. 172, 181, 233 S.E.2d 318, 325 (1977), this Court expressly found that "[t]he Legislature has vested the juvenile court with jurisdiction over children who commit [] status offenses so that the court may enforce order, safety, morality, and family discipline within the community." This Court found justification in the broad powers granted to the circuit court in the status offender statutory scheme by noting that "the class to which status offenders belong has been created under authority of the State's inherent and sovereign parens patriae power[.]" *Id.* at 183, 233 S.E.2d at 326. However, we were careful to emphasize that "status offenders

---

[6] Status offenders are not entitled to jury trials when "incarceration is not a possibility." W. Va. Code § 49-5-6(b).

[7] In fact, a small number of other states have done precisely that. *See* Col. Rev. Stat. § 22-33-104(2)(d) (2012) (exempting students who have been "suspended, expelled, or denied admission" from compulsory school attendance statute); Ind. Code § 20-33-8-31 (same); Kan. Stat. Ann. § 72-8905 (1994) (same); Neb. Rev. Stat. § 79-259 (1996) (same); Vt. Stat. Ann. Tit 16, § 1153 (1999) (same).

8

must be treated in a fashion consistent with the *parens patriae* power, namely, they must be helped and not punished." *Id.*; *see also In the Interest of E. B.,* 287 N.W.2d 462, 465 (N. D. 1980) (finding that status offender classification is designed "to improve the child's condition and to remove the taint of criminality").

However, not only does West Virginia Code § 49-1-4(15)(C) leave to the circuit court's discretion the determination as to whether absences which form the basis of a truancy petition are "without good cause," it further requires a determination by the court that such absences are "habitual." Although petitioner suggests that the Legislature did not intend for students subject to disciplinary suspensions to be treated as truants, we find nothing in the language of the statute or elsewhere which would demand exemption of students who are absent due to disciplinary suspensions from adjudication as habitual truants.[8] To the contrary, regardless of whether a student is absent from school due to

---

[8] We make note of, but are not persuaded by, the language of West Virginia Code § 18-8-4(f)(4) (2010) which "exclude[s] for accountability purposes" the inclusion of disciplinary suspensions in reporting absences to the West Virginia Board of Education. West Virginia Code § 18-8-4(f)(4) requires the attendance director to make an on-demand report to the West Virginia Board of Education on school attendance and further mandates the State Board of Education to promulgate a legislative rule that sets forth the type of student absences which are "excluded for accountability purposes." Section 18-8-4(f)(4) further mandates that absences which are excluded for accountability purposes "include, but are not limited to, excused student absences, *students not in attendance due to disciplinary measures* and absent students for whom the attendance director has pursued judicial remedies[.]" (emphasis added). This legislative rule is embodied in West Virginia C.S.R. § 126-81-4.2.

We find this language immaterial to the case *sub judice* inasmuch as the statute's plain language limits the scope of the exclusion to *accountability for truancy reporting*. It is clear that the reporting exclusion is designed, not to evince a Legislative intent to

9

treat suspension absences differently for truancy purposes, but rather to draw the county and State boards' attention to students whose absences are not otherwise accounted for or addressed.

Concomitantly, we likewise find respondent's citation to West Virginia Code § 18-8-8 inapposite to the issue at bar. Respondent cites to this statute in support of its contention that out-of-school suspensions for improper conduct are statutorily defined as "unlawful" absences and therefore may form the basis of a truancy adjudication. West Virginia Code § 18-8-8, originally enacted in 1941, provides that "if a child be suspended from school because of improper conduct or refusal of such child to comply with the requirements of the school": 1) the school is to notify the Superintendent of the suspension, specifying the time or conditions of such suspension; and 2) readmission may be refused "until such requirements and regulations be complied with." Respondent contends that the further provision in the statute that "[a]ny such child shall be treated by the school *as being unlawfully absent* from the school during the time he refuses to comply with such requirements and regulations," connotes a Legislative intent to treat suspension absences as truancy.

However, the very particular language of this statute seems more directly geared toward the parents of students who have been suspended pending compliance with some school requirement. To that end, the statute indicates 1) that the suspension may only last until the student is in compliance, which would not seem to pertain to a disciplinary infraction—as soon as the behavior/incident stopped, the student would be "in compliance" with a code of conduct; and 2) that the unlawful absence encompasses only that time period when the student is non-compliant, which again would not pertain to a disciplinary suspension—when the child is at home, he is presumably "compliant" or at least not violating a school code of conduct. Moreover, by specifying that pursuant to the "unlawful absences" described in the statute the *parent* may be prosecuted under the compulsory attendance laws--and not the student as a truant--the intent seems to be to compel parents to ensure that their children are compliant with school requirements and do not get a "pass" from prosecution by arguing simply that the child is suspended when the ability to correct the non-compliance is presumably within their control.

Notably, West Virginia Code § 18-8-7 makes it a misdemeanor to "induce[] or attempt[] to induce" a child to "unlawfully absent" himself from school. If suspension due to a disciplinary infraction is a *per se* "unlawful absence" as that term is used in Section 18-8-8, then presumably the principal of the school who suspended the student would be guilty of a misdemeanor. Such an absurd result demonstrates that the term "unlawful absence" as used in West Virginia Code § 18-8-8 bears no legal relevance to determining whether a suspension is necessarily excluded as "good cause" under the habitual truancy statute.

disciplinary suspension or merely lacks the discipline and guidance to ensure regular school attendance, our status offender laws seek to address the core problems underlying the absences for the protection of both the juvenile and the public.

Accordingly, we hold that whether a juvenile's absences from school are "habitual" and are "without good cause," pursuant to West Virginia Code § 49-1-4(15)(C) is to be determined on a case-by-case basis. Such determination lies within the sound discretion of the circuit court and is subject to appellate review only upon an abuse of that discretion. In the case *sub judice*, we find no such abuse of discretion.

2.      *Substantive and Procedural Due Process*

Notwithstanding the circuit court's statutory authority to determine that her suspension absences did not constitute good cause, petitioner further argues that her adjudication under West Virginia Code § 49-1-4(15)(C) on the basis of suspension absences has resulted in an infringement of her constitutional rights to substantive and procedural due process.[9] In that regard, petitioner advances an "as applied" constitutional challenge to West Virginia Code § 49-1-4(15)(C).[10] She contends that by complying with the school-ordered suspension, lest she risk prosecution for trespassing, she was

---

[9] Petitioner articulates no challenge to the subject statutory scheme on the basis of unconstitutional vagueness or overbreadth.

[10] An "as-applied" challenge stands in contrast to a "facial" challenge to the statute. *See* Syl. Pt. 6, *Kolvek v. Napple,* 158 W.Va. 568, 212 S.E.2d 614 (1975) ("A statute may be valid on its face but unconstitutionally applied. The unconstitutional application of the statute may be prohibited and the statute allowed to stand.")

11

essentially forced to violate the compulsory school attendance statutes and therefore was cornered into violating the law no matter what she did. Moreover, she contends that inasmuch as her suspension at the school level did not afford her the procedural due process protections afforded in juvenile court, use of those suspensions to adjudicate her an habitual truant violated her right of procedural due process.

Article III, Section 10 of the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." Although in *Harris*, 160 W.Va. at 179, n.3, 233 S.E.2d at 324, n.3, this Court described due process as an "inherently elusive concept," we have nonetheless succinctly characterized the right to substantive due process as one of fundamental fairness: "[D]ue process . . . is ultimately measured by the concept of fundamental fairness." *State ex rel. Blankenship v. Richardson*, 196 W.Va. 726, 739, 474 S.E.2d 906, 919 (1996); *see also Committee on Legal Ethics v. Printz*, 187 W.Va. 182, 188, 416 S.E.2d 720, 726 (1992) (quoting *U. S. v. Elliott*, 266 F. Supp. 318, 326 (S.D.N.Y. 1967) ("[F]undamental fairness . . . is the heart of due process[.]"); *State ex rel. Peck v. Goshorn*, 162 W.Va. 420, 422, 249 S.E.2d 765, 766 (1978) ("[D]ue process of law is synonymous with fundamental fairness[.]"). Although petitioner's argument on this front is not fully developed, it appears that it is this notion of "fundamental fairness" upon which her substantive due process claim is based. In short, petitioner argues simply that it is fundamentally unfair to penalize her lawful compliance with the out-of-school

suspension by using the absences occasioned thereby as a basis to adjudicate her an habitual truant.

For purposes of determining whether application of the status offender statutory scheme to petitioner violates substantive due process, it is instructive to note that this Court has held:

> The legislature is vested with a wide discretion in determining what the public interest requires, the wisdom of which may not be inquired into by the courts; however, to satisfy the requirements of due process of law, legislative acts must bear a reasonable relationship to a proper legislative purpose and be neither arbitrary nor discriminatory.

Syl. Pt. 1, *State v. Wender*, 149 W.Va. 413, 141 S.E.2d 359 (1965). We have further applied this holding to the juvenile justice scheme, as pertains to status offenders. *See Harris*, 160 W. Va. at 179, 233 S.E.2d at 324. We further stated that, as to the status offender laws, they are part of a "comprehensive system of child welfare[,] [t]he aim of [which] is to protect and rehabilitate children, not to punish them." *Id*. at 183, 233 S.E.2d at 326. We noted that status offenders "have a special position within the current system," *id.* at 183, 233 S.E.2d at 326, and that when the State seeks to exercise its authority under the status offender laws and is therefore "proceeding under color of its *parens patriae* authority, it must actually have fair prospects of achieving a beneficent purpose[.]" *Id*. at 186, 233 S.E.2d at 327.

We therefore are left to determine if adjudicating a juvenile an habitual truant on the basis, in whole or in part, of absences occasioned by an out-of-school

13

suspension is rationally related to a "proper legislative purpose" and further, whether such adjudication is arbitrary or discriminatory. West Virginia Code § 49-1-1(a)(1-3) states that the purpose of the chapter is to provide a "coordinated system of child welfare and juvenile justice," the goals of which are, in part, to "[a]ssure each child care, safety and guidance . . . [s]erve the mental and physical welfare of the child, [and] [p]reserve and strengthen the child's family ties[.]" More pointedly, the child welfare laws are designed to "[p]rovide for early identification of the problems of children and their families, and respond appropriately with measures and services to prevent abuse and neglect or delinquency" and "[p]rovide a system for the rehabilitation of status offenders and juvenile delinquents[.]" W. Va. Code § 49-1-1(a)(8) and (9).

In light of these purposes, we have little difficulty in finding that adjudicating a juvenile a status offender on the basis of absences occasioned by disciplinary suspension is rationally related to the Legislative purpose of "early identification of problems of children and their families" and commensurate rehabilitation of such juveniles. In point of fact, we find status offender adjudication even more critical for a juvenile subject to disciplinary suspension, who is not otherwise being aided or addressed by our child welfare or juvenile justice laws. Clearly, on the basis of the disciplinary action which gave rise to petitioner's suspension, a delinquency petition may have been available to the State. However, we find petitioner's adjudication as an habitual truant under the more lenient status offender laws to have been a measured and compassionate attempt by the State to exercise its sovereign *parens patriae* power to

14

provide early intervention and rehabilitation to petitioner in the least restrictive means available. In light of these considerations, we find nothing arbitrary nor discriminatory about the use of an habitual truancy adjudication occasioned by disciplinary absences to bring petitioner within the ambit of the child welfare and juvenile justice laws; therefore, we find no substantive due process violation.

In addition to substantive due process rights, "[t]he Due Process Clause, Article III, Section 10 of the West Virginia Constitution, requires procedural safeguards against State action which affects a liberty or property interest." Syl. Pt. 1, *Waite v. Civil Service Comm'n*, 161 W. Va. 154, 241 S.E.2d 164 (1977). Petitioner contends that if absences occasioned by an out-of-school suspension are to be used as a basis for a truancy adjudication, procedural due process requires that she be provided all of the same due process rights at the school level *prior to suspension* to which she is entitled under the circuit court's juvenile jurisdiction.[11]

> This Court has held that
>
> [w]hen due process applies, it must be determined what process is due and consideration of what procedures due process may require under a given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been impaired by government action.

---

[11] Petitioner does not, however, contend that she was not afforded the due process rights afforded to her pursuant to West Virginia Code § 18A-5-1a for her temporary, six-day suspension from school.

Syl. Pt. 2, *Bone v. W. Va. Dep't of Corrections*, 163 W.Va. 253, 255 S.E.2d 919 (1979); *see also Lamar Outdoor Advertising v. West Virginia Dept. of Transp.*, 228 W.Va. 68, 717 S.E.2d 255 (2011). This holding focuses our analysis on whether the "precise nature of the government function involved" demands that the procedural due process rights provided for in West Virginia Code § 49-5-2 (2007)[12] must be afforded to a student at the

---

[12] West Virginia Code § 49-5-2 (g) through (j) provide that the following due process rights are available to a juvenile subject to proceedings under Chapter 49:

> (g) A juvenile is entitled to be admitted to bail or recognizance in the same manner as an adult and shall be afforded the protection guaranteed by Article III of the West Virginia Constitution.
>
> (h) A juvenile has the right to be effectively represented by counsel at all stages of proceedings under the provisions of this article. If the juvenile or the juvenile's parent or custodian executes an affidavit showing that the juvenile cannot afford an attorney, the court shall appoint an attorney, who shall be paid in accordance with article twenty-one [§§ 29-21-1- et seq.], chapter twenty-nine of this code.
>
> (i) In all proceedings under this article, the juvenile shall be afforded a meaningful opportunity to be heard. This includes the opportunity to testify and to present and cross-examine witnesses. The general public shall be excluded from all proceedings under this article except that persons whose presence is requested by the parties and other persons whom the circuit court determines have a legitimate interest in the proceedings may attend: Provided, That in cases in which a juvenile is accused of committing what would be a felony if the juvenile were an adult, an alleged victim or his or her representative may attend any related juvenile proceedings, at the discretion of the presiding judicial officer: Provided, however, That in any case in which the alleged victim is a juvenile, he or she may be accompanied by his or her parents

16

school level prior to suspension, if such absences are to be used in an habitual truancy proceeding pursuant to West Virginia Code § 49-1-4(15)(C).

Petitioner argues that the "deprivations" effectuated by virtue of her adjudication as a status offender demand heightened procedural due process before the school orders a suspension which will produce absences in violation of the compulsory school attendance laws. However, as the Supreme Court of Maine noted,

> it is not every loss of liberty which gives rise to an application of the standards of due process required in criminal proceedings. Just as the natural parent may constitutionally place limitation on the child's freedom of locomotion and may substitute the will and judgment of the parent for that of the child and thus constrain the child's will for his own protection, so also may the State in the exercise of its parens patriae guardianship.

*S\*\*\*\* S\*\*\*\* v. State*, 299 A.2d 560, 568 (Me. 1973).

More to the point, petitioner expresses concern that use of out-of-school suspension absences to form the basis of a truancy petition essentially leaves truancy adjudications to the whim of principals. Petitioner suggests that principals may indiscriminately use their authority under West Virginia Code § 18A-5-1a (2006) to

---

or representative, at the discretion of the presiding judicial officer.

(j) At all adjudicatory hearings held under this article, all procedural rights afforded to adults in criminal proceedings shall be afforded the juvenile unless specifically provided otherwise in this chapter.

suspend a student and thereby compel a student to become a "truant," while stripping the student of the due process rights afforded juveniles under West Virginia Code § 49-5-2 when being subjected to a truancy adjudication. We find this concern unfounded. Were this Court to adopt a *per se* rule that absences occasioned by suspension were necessarily lacking in "good cause," or further, that a certain number of such absences were *per se* "habitual," petitioner's argument may have merit.[13] However, as discussed more fully *supra*, the determination of whether an absence is without "good cause" is left to the sound discretion of the circuit court. As such, a mere suspension at the school level does not an habitual truant make. The circuit court is left to determine, in its discretion, not only whether the absences which form the basis of the petition are "without good cause,"

---

[13] We take this occasion to caution that, although not entirely clear from the appendix record below, it appears that the circuit court may have utilized the five-absences "trigger" set forth in West Virginia Code § 18-8-4(b) (2010) as the standard by which to make the determination that petitioner's absences were "habitual." West Virginia Code § 18-8-4(b) sets in motion the procedures mandated to address violations of the compulsory school attendance statutes "[i]n the case of five total unexcused absences of a student during a school year[.]" However, although petitioner did not assign as error the circuit court's conclusion that nine absences without good cause constituted "habitual," we take this opportunity to note that the requirements of West Virginia Code § 18-8-4, as a predicate to prosecution under West Virginia Code § 18-8-2, concern prosecution of a parent or guardian *only* and do not in any way restrict the basis of a truancy petition to absences within a single school year, nor do they create a presumption of "habitualness" for greater than five absences. *See State ex rel. Estes v. Egnor,* 191 W. Va. 36, 443 S.E.2d 193 (1994) (finding that West Virginia Code § 18-8-2 imposes liability against a parent or guardian and makes no provision for prosecution of a student under that statute regardless of age). The broad language of West Virginia Code § 49-1-4(15)(C) and the discretion of the circuit court thereunder is not constrained by the statutory requisites of prosecution of a *parent or guardian* under the compulsory school attendance statutes.

18

but also whether such absences are "habitual."[14]  Accordingly, a juvenile receives the full benefit of the due process rights afforded by West Virginia Code § 49-5-2 at the instant of a truancy adjudication on the basis, in whole or in part, of suspension absences. Rather than being *denied* adequate due process, a juvenile subject to a truancy adjudication which involves suspension absences actually receives two levels of due process—once at the school level prior to suspension and again at the circuit court level upon adjudication.  As such, the "precise nature" of the government functions at issue— enforcement of disciplinary rules at the school level and adjudication for purposes of integration into our juvenile justice system—do not require that school-level due process rise to the level of the procedural protections set forth in West Virginia Code § 49-5-2.

Accordingly, we find that application of West Virginia Code § 49-1-4(15)(C) does not violate petitioner's constitutional rights to substantive and procedural due process.  As such, we find no error in the circuit court's adjudication of petitioner as status offender on the basis of habitual truancy.

## B.

### *Disposition*

---

[14] Therefore, petitioner's hypothetical concern regarding a student with regular attendance and exemplary grades who is suspended for a minor disciplinary infraction and then subject to status offender adjudication is unfounded.  The circuit court has within its discretion the ability to consider the nature of the underlying offense, but more importantly, whether such an isolated incident constitutes "habitual" truancy.  *See also* n.13, *supra*.

Petitioner next assigns as error the circuit court's disposition arising from her adjudication as a status offender. In particular, she argues that the proportional length and conditions of the court-ordered probation to her status as an habitual truant are excessive and an abuse of discretion; she argues further that the transfer of legal custody to the DHHR is likewise erroneous.

1. *Probation*

Petitioner argues that the overall length of her order of probation and, generally, its attendant terms and conditions, are excessive and therefore unconstitutionally punitive. She highlights the fact that she was ordered to three-and-a-half years of probation for a "first time status offender" and the requirement that she stay enrolled in school, although by statute she may withdraw at seventeen. Respondent counters that all of the terms are designed for the protection and rehabilitation of petitioner and are therefore, neither punitive in nature nor subject to an "excessiveness" analysis. Importantly, petitioner appears to concede generally that the circuit court's imposition of probation and its terms is "within the bounds of its' [sic] lawful authority."

West Virginia Code §§ 49-5-11 and -11a govern disposition for juveniles adjudicated as status offenders. West Virginia Code § 49-5-11(d) provides that if allegations alleging a status offense are sustained by clear and convincing proof, "the court shall refer the juvenile to the [DHHR] for services, pursuant to section eleven-a"; however, if the circuit operates a "truancy program," the judge may "in lieu of referring

20

truant juveniles to the department, order that the juveniles be *supervised by his or her probation office.*"[15] (emphasis added).

West Virginia Code § 49-5-11a provides further direction regarding disposition of status offenders. West Virginia Code § 49-5-11a(a) describes the types of services which may be provided by the DHHR and notes that such services "shall be designed to develop skills and supports with their families and to resolve problems related to the juveniles or conflicts with their families." Critically, West Virginia Code § 49-5-11a(b) provides that, if necessary, the DHHR may petition the court for a valid court order: 1) "to enforce compliance with a service plan or to *restrain actions that interfere with or defeat a service plan*"; and/or 2) "to place a juvenile out of home in a nonsecure or staff-secure setting, and/or to place a juvenile in custody of the department" (emphasis added). However, such an order is not dependent upon a petition by the DHHR; rather, the circuit court may enter an order even in absence of such a request by the DHHR pursuant to West Virginia Code § 49-5-11a(c), which provides that "[i]n ordering any further disposition under this section, the court is not limited to the relief sought in the [DHHR's] petition . . . ."

These provisions, read in *pari materia*, clearly evince a Legislative intent to permit the circuit court to place a status offender on probation and order terms and conditions of such probation as the court determines necessary to "enforce compliance

---

[15] The provision regarding supervision by the probation office was added in 2010.

with a service plan or to restrain actions that interfere with or defeat a service plan[.]" *See* Syl. Pt. 3, *Smith v. State Workmen's Compensation Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975) ("Statutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments.").

As noted above, despite petitioner's concession that the statutory scheme grants the circuit court authority to order probation, she contends that the circuit court "threw the book at her" and therefore transformed the rehabilitative means and methods of disposition into "punishment" which was excessive in light of her "first-time" status offense. We are particularly sensitive to such an argument inasmuch as we have previously indicated that the cruel and unusual punishment concepts contained in Article III, Section 5 of the West Virginia Constitution[16] should be broadly applied to status offenders "whom the State has pledged *not* to punish at all, but rather, to protect and rehabilitate." *Harris*, 160 W. Va. at 190, 223 S.E.2d at 329-30.

---

[16] *See* Syl. Pt. 2, *State v. Lewis*, 191 W. Va. 635, 447 S.E.2d 570 (1994):

> Article III, Section 5 of the West Virginia Constitution, which contains the cruel and unusual punishment counterpart to the Eighth Amendment of the United States Constitution, has an express statement of the proportionality principle: "Penalties shall be proportioned to the character and degree of the offense." Syl. Pt. 8, *State v. Vance*, 164 W. Va. 216, 262 S.E.2d 423 (1980).

In *Harris*, we expressly applied the proportionality principles of Article III, Section 5 of the West Virginia Constitution to treatment of status offenders and found that incarceration of status offenders in secure, prison-like facilities was unconstitutional. In reaching that conclusion, we examined three elements utilized by the Fourth Circuit in *Hart v. Coiner*, 483 F.2d 136 (4th Cir. 1973), to determine if certain "punishment" is constitutionally disproportionate: "(1) the nature of the offense itself; (2) the legislative purpose behind the punishment; and (3) what punishment would have been applied in other jurisdictions." *Harris,* 160 W. Va. at 191, 223 S.E.2d at 330. As to the first element, we found that status offenders are "located on the extreme end of the spectrum of juvenile misconduct running from most serious to least serious offenses." *Id*. at 191, 233 S.E.2d at 330. As to the second, we reiterated the well-established legislative purpose of the status offender laws to "enforce[e] family discipline, protect[] children, and protect[] society from uncontrolled children[.]" *Id*. at 192, 233 S.E.2d at 330. We found that incarceration in prison-like facilities with children guilty of criminal conduct was not rationally related to that end. *Id.* at 191-92, 223 S.E.2d at 330. Finally, we found that other jurisdictions had eliminated incarceration of status offenders; therefore, we held that incarceration of status offenders in secure, prison-like facilities violated Article III, Section 5 of the West Virginia Constitution. *Id.* at 192, 223 S.E.2d at 330.

However, unlike incarceration of status offenders, we find the imposition of a term of probation—even for a first-time status offender—to be not only statutorily authorized, but constitutionally proportionate. It is critical to view probation not under

23

the lens of the criminal justice system, but rather the juvenile justice system. With respect to probationary terms and conditions in the adult, criminal context, "[e]very condition of probation constitutes a restriction of liberty[.]" *Louk v. Haynes*, 159 W. Va. 482, 493, 223 S.E.2d 780, 787 (1976). However, as to juveniles, the United States Supreme Court has acknowledged,

> juveniles, unlike adults, are always in some form of custody. Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*. In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's "*parens patriae* interest in preserving and promoting the welfare of the child."

*Schall v. Martin*, 467 U.S. 253, 265 (1984) (quoting *Santosky v. Kramer*, 455 U.S. 745, 766 (1982) (citations omitted). Moreover, this Court, in reviewing the constitutionality of a curfew ordinance, quoted extensively from and found persuasive like reasoning expressed by the United States Court of Appeals for the District of Columbia in *Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999). In particular, we quoted with approval the District Court's findings that

> "unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, *i.e.*, the right to come and go at will." . . . . [I]t [is] anomalous to say that juveniles have a right to be unsupervised when they are always in some form of custody [and] the recognition of such a right would fly in the face of the state's well-established power of *parens patriae* in preserving and promoting the welfare of children. The state's authority over children's activities is unquestionably broader than that over like actions of adults[.]

24

*Sale v. Goldman*, 208 W. Va. 186, 195, 539 S.E.2d 446, 455 (2000) (quoting *Hutchins*, 188 F.3d at 539 (citations omitted)). *See also Harris,* 160 W. Va. at 183, 223 S.E.2d at 326 (noting that the class of status offenders is created under the State's sovereign *parens patriae* power "and not under the plenary power of the State to control criminal activity and punish criminals").

We find that supervision by a probation officer and required compliance with terms and conditions designed to integrate with a juvenile's service plan is a tangible and effective means of fulfilling the laudatory goals of the juvenile justice system. The Court of Appeals of Louisiana found likewise and rejected an attempt to characterize placement of status offenders in approved facilities as punishment. *In the Interest of Gras,* 337 So.2d 641 (La. App. 1976). The *Gras* court found that status offender adjudication was a much-needed

> attempt[] to provide these children with the treatment, guidance, and care which under normal circumstances is provided in the home. The proceedings in the instant case illustrate the concerted effort of the juvenile court and its probation office to act in the best interest of the child by providing her with an environment best suited to meet her adolescent behavior problems.

*Id*. at 645. Similarly, placement of juveniles under the supervision of the court's probation office and ordering compliance with reasonable terms and conditions is designed to create an environment to best enable the juvenile to address the issues which brought the juvenile within the scope of the juvenile justice system in the first instance. More importantly, in fulfillment of its *parens patriae* power, probationary supervision

25

allows the State to provide the guidance and discipline which is clearly otherwise lacking at home.

Insofar as the particular terms and conditions of probation ordered by the circuit court are concerned, petitioner highlights only one for substantive attack—not surprisingly, the requirement that she stay enrolled in school until she graduates. Petitioner contends that since the compulsory school attendance statute permits her to withdraw at age seventeen, the circuit court's attempt to force her to remain enrolled beyond seventeen is erroneous.[17] We disagree. First, we note that the circuit court's order does not wholesale prohibit petitioner from withdrawing from school; rather, it indicates that she may not "change her status of school *unless approved by the Court*." (emphasis added). Secondly, we find that this particular term of probation, obviously, is exquisitely designed to give effect to the very purpose of the underlying adjudication and further does credit to the overall scheme of juvenile justice. We find more than adequate support within the parameters set forth in West Virginia Code § 49-5-11a permitting the court to enter an order "restrain[ing] actions that interfere with or defeat a service plan" to justify this term of probation in light of the basis upon which petitioner was adjudicated a status offender. *See also In re Marbella P.,* 221 P.3d 38, 41 (Az. 2009) (holding that requirement to stay enrolled in school beyond compulsory age bore rational

---

[17] West Virginia Code § 18-8-1a(a)(3) (2010) provides that "[b]eginning with the 2011-2012 high school freshman cohort class of students . . . compulsory school attendance . . . continues to the seventeenth birthday or for as long as the student continues to be enrolled in a school system after the seventeenth birthday." Petitioner was a freshman during the 2011-2012 school year.

relationship to purpose of probation); *In re Robert M.*, 209 Cal. Rptr. 657, 659 (Cal. Ct. App. 1985) (finding that school attendance as condition of probation is "rationally related to rehabilitation and prevention of future criminality"); *In re Wendy C.*, 520 N.Y.S.2d 277, 279 (1987) (finding that continued enrollment in school beyond compulsory age was within court's "continuing supervisory authority" over juvenile).

As such, subject to our holding set forth *infra* regarding the jurisdictional age limit of the circuit court's order of probation, we find no error in the circuit court's imposition of probation, nor in any of its terms and conditions, including but not limited to the requirement that petitioner stay enrolled in school until graduation, unless otherwise permitted by the circuit court.[18]

2. *Transfer of Custody*

Petitioner next argues that the circuit court erred in its disposition by transferring her legal custody to the DHHR without the requisite findings in support of such a transfer. While not expressly confessing error, respondent offers no argument in

---

[18] Moreover, we find all of the remaining terms and conditions ordered by the circuit court, which were only summarily criticized by petitioner, to be likewise geared toward "restrain[ing] actions that interfere with or defeat a service plan" as permitted by West Virginia Code § 49-5-11a(b)(1) and therefore proper. *See* n.3 *supra. Accord State v. M.D.J.,* 169 W. Va. 568, 289 S.E.2d 191 (1982) (utilizing enabling statutory language under West Virginia Code § 49-5-13(b)(3)(b) to determine validity of probationary terms for juvenile delinquent).

support of the circuit court's transfer of custody,[19] noting merely that the circuit court mercifully declined to place petitioner in a juvenile facility. Regardless, however, we find that the circuit court's transfer of custody, while within its statutory authority, did not contain the proper prerequisite showing and was wholly lacking in the appropriate findings and conclusions required.

Without question, status offenders are subject to out-of-home placement and/or a custody transfer. As noted above, West Virginia Code § 49-5-11a(b) provides that the court may, "if necessary," order that a juvenile be placed "out of home in a nonsecure or staff-secure setting, and/or [] in custody of the department" upon petition by the DHHR or at the court's behest in absence of a petition by the DHHR.[20] However, as we first noted in *Harris*, committing juveniles to the custody of the state in the absence of a showing of necessity is an improper use of *parens patriae* power: "[T]he ancient doctrine of *parens patriae* is in full retreat on all fronts except in those very narrow areas where the state can demonstrate, as a matter of fact, that its care and custody is superior to any available alternative." *Id.,* 160 W. Va. at 187, 233 S.E.2d at 328 (citing *State ex rel. Hawks v. Lazaro*, 157 W. Va. 417, 202 S.E.2d 109 (1974)). *See also* W. Va. Code § 49-1-1(b) (stating that "it is the intention of the Legislature to provide for removing the

---

[19] As such, "the Court will assume that the respondent agrees with the petitioner's view of the issue." W.V.R. App. Proc. 10(d).

[20] *See* West Virginia Code § 49-5-11a(c) discussed *supra*.

child from the custody of his or her parents only when the child's welfare or the safety and protection of the public cannot be adequately safeguarded without removal").

To that end, this Court has previously articulated the requisite showing and commensurate findings and conclusions required of the circuit court before any such transfer of custody may occur. In Syllabus Point 2, in part, *State v. Damian R.*, 214 W. Va. 610, 591 S.E.2d 168 (2003), this Court held:

> [A] petition seeking an order regarding transferring custody of the status offender to the Department and/or out-of-home placement under *W. Va. Code*, 49–5–11a(b)(2) [1998] . . .may only be granted upon a showing by clear and convincing evidence that such a custody or placement order is *actually necessary*; that the *effective provision of services cannot occur absent such an order*; and that *all reasonable efforts have been made to provide appropriate services without an out-of-home placement or custody transfer*; and orders granting such placement and/or transfer must be based on *specific findings and conclusions by the court with respect to the grounds for and necessity of the order*.

(emphasis added). As noted hereinabove, the circuit court's order states simply that "it is contrary to the welfare of [petitioner] for her legal custody to remain with her parents and it is in her best interest of the child [sic] to have her legal custody be with the Department[.]"[21] Clearly, the lack of evidence adduced as to this issue and the court's conclusory finding are insufficient to comply with the requirements of *Damian R.*

---

[21] The transcript from the hearing contained in the appendix record reflects only that the probation officer inquired of the court whether legal custody, which had been placed with the DHHR during the preliminary hearing, was being "released back to the

Moreover, we find that the circuit court's order transferring legal custody of petitioner was not only erroneous due to its lack of evidentiary basis, findings and conclusions, but further erroneously denied both petitioner and the respondent adult below, Emma B.,[22] their due process rights. West Virginia Code § 49-5-11a(b) provides that an out of home placement or custody transfer must be made pursuant to a "valid court order, as defined in section four [§ 49-1-4], article one of this chapter[.]" West Virginia Code § 49-1-4(16) defines "valid court order" as one in which the juvenile received "the full due process rights guaranteed to such juvenile by the constitutions of the United States and the State of West Virginia." In that regard, and as pertains to both the petitioner and the "affected parent," in Syllabus Point 3 of *Damian R.*, we further held, in part:

> [As to] a circuit court's decision under *W. Va. Code*, 49–5–11a(b)(2) [1998] to award custody of a juvenile status offender to the Department of Health and Human Resources[,] . . . the constitutional rights of due process, representation by counsel, notice, opportunity to be heard, and to present and cross-examine witnesses must be afforded to the juvenile *and the affected parent* in a proceeding brought pursuant to said statutory provision.

*Id*. (emphasis added). There is no evidence in the record below that the petitioner was on notice of the potential permanent transfer of custody, much less afforded the opportunity

parents." Addressing the petitioner, the court responded simply that legal custody would remain with the DHHR but that physical custody would "continue with the parents as long as you are doing well." The circuit court warned petitioner that if she "mess[ed] up," "the Department will have the authority to take custody of you and place you in a facility until the next hearing."

[22] Emma B., although not a party to this appeal, was identified below as the "respondent adult" and is identified therein as the petitioner's biological mother.

30

to be heard on the matter or to present and cross-examine witnesses. Moreover, there is no evidence that the affected respondent parent, Emma B., was afforded the right of representation or the above-referenced due process rights. As such, we reverse the circuit court's transfer of legal custody and remand this matter for further proceedings as appropriate consistent with our holdings in *Damian R.*

*3.      Extension of Probation Beyond Petitioner's Eighteenth Birthday*

Finally, petitioner contends that the circuit court erred in ordering that her probation extend until she graduates from high school. Petitioner contends that the circuit court's juvenile jurisdiction over her extends only until the age of eighteen and inasmuch as she will reach the age of eighteen approximately one month prior to the customary commencement of graduating senior classes, the circuit court's order exceeds its jurisdiction. Respondent, implicitly conceding that the circuit court has no such jurisdiction beyond the age of eighteen, argues simply that this issue is not ripe since petitioner has not yet turned eighteen and, theoretically, could graduate prior to that time. Respondent maintains that in the event petitioner has not graduated by her eighteenth birthday, she may then move to have the circuit court's probationary order dismissed at that time.

West Virginia Code § 49-1-2 (1997) provides, in part, that "[a]s used in this chapter, 'juvenile' or 'child' means any person under eighteen years of age." Likewise, the definitional section under "Juvenile Proceedings" defines "child" or "juvenile" as "a

31

person who has not attained the age of eighteen years, or a person who is otherwise subject to the juvenile jurisdiction of a court pursuant to this article." W. Va. Code § 49-5-1(b) and (d). The latter provision, however, does not serve generally to extend the juvenile jurisdiction of the court beyond the age of eighteen to those who at any time come under the juvenile jurisdiction of the court. Rather, it allows for the extension of jurisdiction as expressly provided for in West Virginia Code § 49-5-2(f), which states that as to juveniles adjudicated *delinquent*, "the jurisdiction of the court which adjudged the juvenile delinquent continues until the juvenile becomes twenty-one years of age. The court has the same power over that person that it had before he or she became an adult[.]" This exception is obviously inapplicable to the case *sub judice* as petitioner was not adjudicated delinquent and we find no other provision which would provide for extension of the court's jurisdiction over a juvenile status offender beyond the age of eighteen years.

In fact, albeit in *dicta*, this Court has previously had occasion to specifically admonish lower courts that probation orders for juvenile status offenders may not extend beyond the age of eighteen. In *State v. Steven H.*, 215 W. Va. 505, 511, n.6, 600 S.E.2d 217, 223, n.6 (2004), the Court *sua sponte* noted that the probation order before it improperly attempted to extend Steven H.'s probation until he turned twenty-one. We counseled that "future probation orders for juvenile status offenders, while otherwise acceptable and discretionary with the court, should extend only until the status offender attains the age of eighteen years." Accordingly, we now expressly hold that, pursuant to

32

West Virginia Code § 49-5-2 (2007), the jurisdiction of courts over a juvenile adjudicated as a status offender as defined in West Virginia Code § 49-1-4(15) extends only until the juvenile attains the age of eighteen.

We therefore find that aspect of the circuit court's order placing petitioner on probation until she "graduates from high school" to be erroneous and remand this case to the circuit court for entry of an order providing that petitioner be placed on probation until the earlier of her eighteenth birthday or graduation from high school.

## IV. CONCLUSION

For the reasons set forth more fully above, we affirm the order of the circuit court adjudicating petitioner a status offender and placing her on probation. However, we reverse that portion of the circuit court's order transferring legal custody to the DHHR and attempting to extend petitioner's probation until she graduates from high school. We further remand this matter to the circuit court for further proceedings as appropriate regarding the transfer of legal custody and for entry of an appropriate order placing petitioner on probation until the earlier of her eighteenth birthday or graduation from high school.

Affirmed in Part; Reversed in Part; and Remanded with Directions.

33